**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **GENERATIONS AT ROCK ISLAND LLC,** | ) ) ) | |
| **PLAINTIFFS,** | ) ) | |
| **v.** | ) ) | Case No. 1:20-cv-3817 |
| **The ILLINOIS DEPARTMENT OF PUBLIC HEALTH;** | ) ) | |
| **DR. NGOZI EZIKE, in her official capacity as the Director of the Illinois Department of Public Health,** | ) ) ) ) | Judge _____ |
| **The CENTERS FOR MEDICARE AND MEDICAID SERVICES** | ) ) | |
| **And** | ) ) ) | |
| **SEEMA VERMA, in her official capacity as the Administrator of the Centers for Medicare and Medicaid Services, 223 N. Michigan Ave. Suite 60 Chicago, IL 60601** | ) ) ) ) ) ) | |
| **DEFENDANTS.** | ) ) | |

## COMPLAINT FOR PRELIMINARY AND PERMANANT INJUNCTION AND DECLARATORY JUDGMENT

Plaintiff, Generations at Rock Island, by its attorneys, and for its Complaint against

Defendants the Illinois Department of Public Health, Dr. Ngozi Ezike, in her official capacity as

the Director of the Illinois Department of Public Health, the Centers for Medicare and Medicaid

Services, and Seema Verma, in her official capacity as the Administrator of the Centers for

Medicare and Medicaid Services, and states as follows:

1

## I.      NATURE OF THE CASE

Skilled Nursing Facilities that participate in the Medicare and Medicaid programs are regulated by the Center for Medicare and Medicaid Services ("CMS"), with surveys performed by each state's survey agency. In the State of Illinois, the Illinois Department of Public Health ("IDPH") is the survey agency for CMS. IDPH routinely inspects facilities like Generations at Rock Island ("Rock Island" or the "Facility").

As a result of these inspections, the IDPH issues, and CMS then adopts, deficiencies against Facilities. A "deficiency" is when the survey agency alleges failure to "substantially comply" with the requirements of participation in the Medicare and Medicaid programs. IDPH also recommends remedies to CMS, and ultimately, CMS determines which remedies to impose on the Facility.

Each of deficiency (also referred to as "tag" or "citation") is assigned a "Scope/Severity" level, with a range of possible remedies. Each deficiency, depending on the assigned level of Scope/Severity, is assigned a numerical value, which is used to calculate that facility's "Health Inspection Domain" total. This number is used for a variety of purposes, including for calculation of the health inspection score for CMS' Facility Five-Star Quality Rating system and for identifying facilities as a "Special Focus Facility" ("SFF") for CMS' SFF Program Lists.

CMS does not grant a hearing for all deficiencies issued; the majority of all deficiencies cited do not trigger CMS granting a hearing right in front of a CMS Administrative Law Judge ("ALJ"). Facilities are denied the opportunity to contest most citations, unless they rise to at least a "G" level on the scope/severity chart and CMS imposes a remedy, such as a Civil Money Penalty or "CMP."

Even when CMS does grant a hearing right, that hearing process may take years before a Final Order is issued by the ALJ.

Each deficiency written, regardless of whether or not the Facility had the opportunity to request a hearing or whether or not CMS has issued a Final Order on the matter is published and is used to calculate the Facility's Five Star Quality Rating. The methodology for this Five Star Rating is the basis for identifying facility for each state's "Special Focus Facility" ("SFF") Program lists. There is no hearing right for either placement on the "Candidate List" or on the SFF list itself. Placement on the SFF list directly, and negatively, impacts a Facility's business interests, implicating the Facility's due process rights to a hearing. Facilities are placed on these Special Focus Lists based on a combination of citations they were not allowed to contest at hearing and citations where a hearing is still pending.

Defendants use placement on the SFF to direct additional surveys, enhance penalties, publicize alleged negative compliance histories, and even make determinations regarding the placement of a monitor, transfer of residents or termination of the Facility's Medicare/Medicaid provider agreement without a fair, impartial hearing in violation of due process. Further, a Facility can be placed on the SFF list even when the citations that led to this designation are still being contested.

The placement on this list and the posting of this designation, along with the enhanced regulatory scrutiny that accompany these acts, constitutes a violation of the Facility's right to due process to have the underlying citations heard before an Administrative Law Judge prior to placement on a SFF list. Defendants have denied Plaintiffs the opportunity to contest the underlying citations prior to imposing this negative designation.

Plaintiffs seek to require Defendants Dr. Ngozi Ezike, in her official capacity as Director of the Illinois Department of Public Health, and Seema Verma, in her capacity as Administrator for Centers for Medicare and Medicaid Services, to comply with CMS Medicare and Medicaid regulations, as well as the U.S. Constitution, to conduct an impartial hearing and forego imposition of penalties, up to and including placement on the SFF, unless and until due process is served in compliance with the Federal rules and regulations. The Defendants penalize Plaintiffs for unreviewed allegations of noncompliance and fail to afford Plaintiffs the opportunity to refute findings of noncompliance. This flies in the face of Due Process under the Fourteenth Amendment to the United States Constitution.

## I.  JURISDICTION AND VENUE

This action arises under the Federal Medicare and Medicaid Act and its implementing regulations. Jurisdiction of this court is invoked to secure protection to redress the deprivation under color of state law, statute, custom and/or usage of a right, privilege and/or immunity guaranteed to Plaintiffs by United States Constitution and by 42 U.S.C. §1983 and other Acts of Congress and is proper under 28 U.S.C. §§ 1331 and 1334(a)(3). Venue lies in this forum pursuant to 28 U.S.C. § 1391(e).

## II.  THE PARTIES

1.      Generations at Rock Island, an Illinois limited liability company, is a skilled nursing facility in Rock Island, Illinois. The Facility is "certified" by CMS to participate in the Federal Medicare and Medicaid Program and is holder of a "provider agreement."

2.      The Illinois Department of Public Health ("IDPH") is the State of Illinois agency responsible for surveying skilled nursing facilities on behalf of both the State of Illinois and the

4

Centers for Medicare and Medicaid Services for compliance with Illinois law and the Federal Conditions of Participation for Medicaid.

3. Defendant Dr. Ngozi Ezike is the Director of the Illinois Department of Public Health, and at all times material to this Complaint acted under color of state law in administering the regulations, customs, policies, and practices material herein. Defendant Ezike is sued in her official capacity only.

4. The Centers for Medicare and Medicaid Services ("CMS") is the agency within the Department of Health and Human Services that administers the Medicare and Medicaid programs.

5. Defendant Seema Verma is the Administrator of CMS. Defendant Verma is sued solely in her official capacity.

### III. STATEMENT OF FACTS

6. Skilled nursing facilities that participate in the Federal Medicare and Medicaid programs must satisfy minimum standards of patient care in order to receive reimbursement for patient services. 42 U.S.C. § 1395i–3(a)–(d); 42 C.F.R. § 483, § 483.25.

7. Rock Island is a participating provider.

8. CMS is the Federal agency to which the Department of Health and Human Services has delegated the authority to administer the Medicare and Medicaid programs, pursuant to the Social Security Act, 42 U.S.C. §§ 1396a(13)(A)(iv), 13964(a)(1)(B).

9. CMS contracts with state agencies to conduct unannounced compliance surveys of participating skilled nursing facilities. 42 U.S.C. § 1395aa.

10. These standard surveys, commonly called annual surveys ("Annual Health Survey") must be performed at least every fifteen months. 42 U.S.C. § 1395i–3(g)(2)(A)(iii).

11.     IDPH is the State Agency that contracts with CMS to conduct compliance surveys in Illinois.

12.     IDPH conducts Annual Health Surveys in Illinois.

13.     In addition to these annual surveys, IDPH also conducts complaint investigation surveys ("Complaint Surveys") to investigate complaints called in to IDPH controlled hotlines and facility reported incidents.

14.     Facilities in Illinois are mandated to report certain occurrences to IDPH.

The Five-Star Quality Rating System and the Special Focus Facility Program

15.     The methodology utilized by CMS for identifying facilities for the SFF program is based on the same methodology used in the health inspection domain of the Five-Star Quality Rating System.

16.     CMS created the Five-Star Quality Rating System.

17.     CMS created the health inspection domain calculations that are part of the Five-Star Quality Rating System.

18.     CMS created the health inspection domain calculations that directly inform placement of a facility on the SFF lists.

19.     The health inspection calculation is based on a three year survey compliance history that includes three "cycles" of annual surveys and the complaint investigations that are conducted during those cycles. This constitutes approximately three years of inspection history.

20.     There are three annual cycles, each containing an annual survey and the complaint surveys that fall into that year. Each facility has a Health Inspection Rating Cycle 3, Health Inspection Rating Cycle 2, and Health Inspection Rating Cycle 1, representing the three years of data used to calculate the Facility's health inspection score.

21. Each deficiency written during these three cycles is used to calculate the health inspection score.

22. Only certain deficiencies are granted the right to a hearing in front of the CMS Administrative Law Judge.

23. Even deficiencies that are granted the right to a hearing in front of the agency's ALJ are used to calculate the health inspection score before the ALJ has issued a Final Order.

24. Both Annual Health Surveys and Complaint Surveys involve inspecting the facilities for compliance with the conditions of participation in the Medicare and Medicaid programs and both can result in citations.

25. State agency surveyors record alleged violations, known as "deficiencies," and rate them according to scope and severity. 42 C.F.R. § 488.408.

26. The state agency assigns an alphabetical scope and severity value, A through L, to the deficiency.

27. "A" is the least serious rating and "L" is the most serious rating.

28. Alleged deficiencies are identified with a "Tag" designation that identifies the regulatory provision allegedly violated.

29. The alleged deficiencies are then referred to CMS for "enforcement actions."

30. Alleged deficiencies are made part of the public record shortly after they are written, often being published before a Facility has had an adequate opportunity to contest the allegations through the hearing process.

31. CMS uses unreviewed survey deficiencies in the calculation of a facility's Star Rating, and thus uses unreviewed survey deficiencies in the calculation of the Facility's health inspection domain which is used for placement on the SFF list.

32.     Each alleged deficiency is assigned a numerical value that is directly tied to the scope and severity designation assigned to that tag.

33.     More deficiencies and higher levels of scope and severity of these deficiencies directly translate into higher points assigned.

34.     These totals are tallied and the ultimate calculation is converted into the Facility's "Health Inspection" score.

35.     Each year that passes, the deficiency is credited with less weight, until they "roll off" of the Facility's Health Domain point total.

36.     The facilities with the most points in a state then become candidates for the SFF program. In each state, the SFF candidate list is full of Facilities who have the highest point totals from three years of inspections. Using those point totals, CMS and the State place up to five (5) Facilities on the SFF, with up to thirty (30) facilities on a SFF "Candidate List."

37.     Each state has a SFF Candidate list "pool" that consists of, at minimum five (5) facilities and at maximum thirty (30) facilities.

38.     State agencies, like IDPH, use this list to select nursing homes to fill the SFF slot(s) in their states.

39.     Due Process dictates that the results of a survey should not be uploaded prior to the resolution of a formal hearing process.

40.     Due Process dictates that the points assigned to a deficiency should not trigger placement on the SFF list until the resolution of a formal hearing process for the underlying citations.

41.     Defendants are uploading survey results prior to completion of the formal hearing process.

8

42. Defendants are placing Facilities on the SFF lists prior to completion of the formal hearing process.

43. The formal hearing process takes significant time to be resolved, letting these contested deficiencies impact the Plaintiff Facility's quality rating for years, prior to final order.

44. This delay also allows for a Facility to be named a SFF even when the citations that directly caused that designation are still being contested at a hearing.

45. The formal hearing process can take longer than three years.

46. The length of the hearing process means that deficiencies are posted for, often, the full period they would have counted had a hearing been waived, regardless of the outcome of the hearing.

47. If a Facility wins a CMS hearing, there is no method to correct an erroneous placement on the SFF list or the damage attributed to the posting of deficiencies.

48. If a provider appeals a deficiency alleged in a survey, the deficiency must either be dismissed or reviewed. *Plott Nursing Home v. Burwell,* 779 F.3d 975 (9th Cir.2015).

49. Unreviewed citations must either be dismissed or reviewed. *Id*.

50. The regulations provide for a hearing where certain penalties, such as civil monetary penalties or termination of a provider agreement, are imposed. 42 U.S.C. § 1395i–3(h)(2)(B)(ii); 42 C.F.R.§ 431.153; 42 C.F.R. § 498.5.

51. Appeals procedures must be provided following an adverse action including the "imposition of a civil money penalty or other alternative remedy." 42 C.F.R. § 431.151(a)(1)(ii).

52. CMS and the State are required to comply with mandatory appeals procedures.

53. CMS and the State are required to make an appeal procedure available "to a Nursing Facility (NF) that is dissatisfied with a State's finding of noncompliance that has

resulted in one of the following adverse actions: (i) Denial or termination of its provider agreement. (ii) Imposition of a civil money penalty or other alternative remedy." 42 C.F.R. §431.151.

54. CMS or the State must give the facility a full evidentiary hearing for any of the actions specified in § 431.151, with limited exceptions not applicable here. 42 C.F.R.. § 431.153.

55. Initial determinations of noncompliance are subject to appeal. 42 C.F.R. § 498.3(d).

56. During the time an appeal process is pending, the alleged deficiencies are published in the public domain and are used for calculation of the Health Inspection Score that determines placement on the Special Focus Facility list.

57. IDPH conducted inspections at the Plaintiff Facility and referred alleged deficiencies to CMS.

Implications of Placement on the SFF

58. Once IDPH selects a Facility as an SFF, the state survey agency, on CMS's behalf conducts a full, onsite inspection of all Medicare requirements of participation every six (6) months.

59. Once IDPH selects a Facility as an SFF, the state survey agency, on CMS's behalf recommends progressive enforcement, such as fines or denial of Medicare payment.

60. This enhanced inspection schedule and progressive enforcement continues until either the facility graduates from the SFF or is terminated from the Medicare and/or Medicaid programs.

61. A facility cannot graduate from the SFF list if it has any single deficiency at an "F" level of scope/severity or higher in a set period of time.

62. A facility will graduate from the program once it has completed two consecutive standard surveys with no noncompliance deficiency citations at a scope and severity level of "F" or greater, and has no complaint surveys with deficiencies cited at "F" or greater in between those two standard surveys.

63. A facility may also be removed from the SFF list through an involuntary termination by CMS if it fails to graduate from the program after three standard surveys.

64. An "F" level of scope/severity indicates an alleged deficiency that has not caused "actual harm" to a resident.

65. Per CMS's contention, an "F" level of scope/severity for a deficiency does not carry with it a right to a hearing in front of an Administrative Law Judge.

66. Families and residents are notified of placement on the SFF.

67. Stakeholders are notified of placement on the SFF.

68. Banks and mortgage holders are notified of placement on the SFF.

69. The greater community is notified of placement on the SFF due to publication of the list on the internet.

70. Families are encouraged by CMS to use these lists, and the Nursing Home Compare website to view information about the Nursing Home's star ratings when making decisions regarding placement.

71. The SFF list available to insurance companies, referral sources, and other business partners.

Generations at Rock Island

72. On or about June 11, 2020, Rock Island received notice from IDPH that is was being moved from the Special Focus Facility Candidate List to the SFF List.

11

73. The letter stated that the Facility has been designated by CMS as a SFF based on poor compliance history for the past three year.

74. The Notice identified that one purpose of the SFF program is to "end the pattern of repeated cycles of non-compliance with quality of care requirements."

75. Rock Island's placement on the SSF Candidate list and later SFF list is based on three years of alleged compliance history.

76. Rock Island's Weighted Health Inspection score according to the June 2020 Provider Rating Report is 398.7 points.

77. Rock Island's Weight Health Inspection score is what triggered the Facility to be placed on the Candidate and, later, SFF lists.

78. COVID-19 has impacted the calculation of the Health Inspection Scores, because CMS suspended routine survey activity.

79. Due to this suspension, surveys conducted on March 4, 2020 or after are not being used to calculate the health inspection rating at this time.

80. Per CMS' Nursing Home Compare site, the three Cycles that currently account for Rock Island's Health Inspection score are (1) April 1, 2017 – March 31, 2018, with an Annual survey on August 13, 2017; (2) April 1, 2018 – March 31, 2019, with an Annual survey on July 20, 2018; and (3) April 1, 2019 – March 3, 2020, with an Annual survey on July 2, 2019.

81. While CMS and IDPH have conducted a number of surveys and investigations during this time frame, only two have triggered a clear and unencumbered hearing right.

82. On or about July 2, 2019, IDPH concluded an Annual survey at the Facility.

83. This July 2, 2019 survey was abnormally poor for the Facility and resulted in 26 alleged deficiencies, with the highest at a scope/severity level of "K."

84. This July 2, 2019 survey earned the Facility an un-weighted score of approximately 429.00 points.

85. When weighted, and with revisits taken into account, this July 2, 2019 survey earned the Facility approximately 321.75 of its current weight point total.

86. The bulk of the Facility's health inspection score is due to the citations written during the July 2, 2019 survey.

87. The Facility properly and timely requested a hearing contesting the findings of this July 2, 2020 survey.

88. As of the date of this filing, there has been no final order entered by the ALJ on this matter.

89. This weighted score is used to calculate both the Facility's Five-Star Quality Rating and the Facility's placement on the SFF list.

90. On or about September 17, 2019, IDPH conducted a complaint investigation survey at the Facility.

91. The Facility was cited at a scope/severity level of "G" on a September 17, 2019 survey.

92. A "G" level citation is given an un-weighted point total of twenty (20); once assigned the weighted score, approximately ten (10), this citation does not warrant enough points for placement on the SFF list.

93. The Facility did properly and timely request a hearing contesting the findings of this September 17, 2019 survey.

94. As of the date of this filing, there has been no final order entered by the ALJ on this matter.

95.     On or about the following dates within the three year cycle, IDPH inspected the Facility and found no alleged deficiencies:

 a.  In 2017: April 26, May 23, June 9, June 21, December 12.

 b.  In 2018: January 30, February 7, April 11, May 8, September 27, October 18.

 c.  In 2019: February 7, March 5, March 28, April 3, May 16, July 16, September 25, October 4.

 d.  In 2020: January 2, January 14, January 22, February 3, February 19.

96.     The remainder of the points earned by the Facility, approximately 66.95 points, are attributable to the following annual surveys and complaint investigations, for which the Facility was granted no hearing right:

 a.  On or about August 13, 2017, IDPH conducted an unannounced annual health survey of Generations at Rock Island; The surveyors cited Rock Island for twelve different alleged Tag numbered deficiencies, with the highest being at scope/severity level "E".

 b.  IDPH conducted six complaint surveys of Rock Island during Cycle 3 on or about September 13, 2017, August 2, 2017, July 18, 2017, May 10, 2017, April 8, 2017, and December 15, 2016 resulting in the imposition of a total of nine alleged deficiencies, with the highest being scope/severity level of "G".

 c.  On or about July 20, 2018, IDPH conducted an unannounced annual health survey of Generations at Rock Island; The surveyors cited Rock Island for five different alleged Tag numbered deficiencies, with the highest being at scope/severity level "D".

14

d.  IDPH conducted three complaint surveys of Rock Island during Cycle 2 on or about August 29, 2018, December 26, 2017, and November 15, 2017 resulting in the imposition of a total of four alleged deficiencies, with the highest being scope/severity level of "D".

e.  On or about July 2, 2019, IDPH conducted the unannounced annual health survey of Generations at Rock Island first detailed in paragraph 82 above.

f.  Rock Island requested an ALJ hearing to dispute the results of the survey, but the deficiencies are posted for the public and used to determine placement on the SFF.

g.  IDPH conducted five complaint investigations of Rock Island during Cycle 1 on or about December 12, 2019, December 5, 2019, November 20, 2019, August 16, 2019, August 7, 2019, June 14, 2019, March 28, 2019, and March 20, 2019 resulting in the imposition of a total of twelve alleged deficiencies, with the highest being scope/severity level of "G".

97.  As a result of the inclusion of contested survey results, Rock Island's Health Inspection Star Rating is one out of five stars.

98.  As a result of the inclusion of contested survey results, Rock Island has been placed on the SFF list.

99.  The Facility was provided a Statement of Deficiencies and Plan of Correction Form CMS-2567, citing deficiencies for alleged failures to remain in substantial compliance with the participation requirements in the Medicare and Medicaid programs.

100.  In response to the Notice of Deficiencies received by the Facility, Rock Island requested a hearing where the right to a hearing was noted.

101.    As noted in the above allegations, most of the Notice of Deficiencies at issue failed to notify Plaintiffs of the right to a hearing.

102.    Survey results and deficiency allegations are posted to a public website shortly following the survey and used to calculate the Health Inspection score that is used for placement on the SFF list, even when hearing results are pending.

103.    Survey results and deficiency allegations are used to determine placement on the SFF regardless of whether or not the facility was granted a hearing in front of an impartial judge.

104.    Survey results and deficiency allegations are used to determine placement on the SFF regardless of whether or not the facility has completed the hearing process in those situations where the facility has a clear right to a hearing.

105.    The posting and use of deficiencies must be in accordance with statute. 42 U.S.C. § 1395–3(b)(5)(E).

106.    The use of unreviewed deficiencies for placement on the SFF has a profound and negative impact on Rock Island and other similarly situated Skilled Nursing Homes.

107.    The publication of all deficiencies and the use of these deficiencies to determine placement on the SFF has significant detrimental effects on Plaintiffs' businesses.

108.    Placement on the SFF enhances the scrutiny faced by a Facility and increases the frequency of surveys.

109.    Placement on the SFF enhances the enforcement remedies imposed by the state agency and CMS.

110.    Placement on the SFF may preclude participation in Insurance Service Networks, Accountable Care Organizations, and Preferred Provider Networks.

111.    Placement on the SFF may impact Terms and Conditions provided by lenders, including the U.S. Department of Housing and Urban Development.

112.    Moreover, each deficiency is considered during future surveys and the determination of subsequent remedies, including the imposition of a CMP.

113.    CMS is not providing a swift formal hearing right to disputed deficiencies.

114.    Defendants are disclosing survey results in violation of federal and state laws and regulations.

115.    Defendants are basing Special Focus Facility determinations on alleged deficiencies without first providing an evidentiary hearing, in violation of Constitutional due process, and federal and state laws and regulations.

116.    This use and disclosure has an extreme punitive effect on Plaintiff Facilities in violation of due process rights.

117.    Further, the State is implementing remedies in the form of punitive public deficiency postings outside the framework of § 488.406 that are not in the state plan and are not approved by CMS.

118.    Where the State elects to pursue its own remedies, state plan amendments requirements are as follows:

> **(c)**State plan requirement. If a State wishes to use remedies for noncompliance that are either additional or alternative to those specified in paragraphs (a) or (b) of this section, it must -
>
> **(1)** Specify those remedies in the State plan; and
>
> **(2)** Demonstrate to CMS's satisfaction that those remedies are as effective as the remedies listed in paragraph (a) of this section, for deterring noncompliance and correcting deficiencies.
>
> 42 C.F.R. § 488.406(c).

119. Available remedies are provided in 42 C.F.R. §488.406 and include "[a]lternative or additional State remedies *approved by CMS".* 42 C.F.R. §488.406(a)(9) (emphasis added.)

120. The Administrative Procedure Act ("APA") § 706(2)(A) requires a reviewing court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

121. The APA requires a reviewing court to "hold unlawful and set aside" agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## IV. CAUSES OF ACTION

## COUNT ONE - VIOLATIONS OF SUBSTANTIVE AND PROCEDURAL DUE PROCESS

122. Plaintiffs incorporate all paragraphs set out above as if fully set forth herein.

123. Defendants' failure to provide a hearing on Plaintiffs' unreviewed deficiencies prior to placement on the Special Focus Facility list will affect the imposition and amount of civil monetary penalties for future deficiencies, increases the frequency of survey activity, increases the risk of termination of the provider agreement, and interferes with Plaintiffs' business opportunities.

124. To comply with the Due Process guarantees under the United States Constitution, the Defendants must provide the Plaintiffs with a meaningful notice that apprises them of the opportunity to appeal and the right to a hearing.

125. Moreover, the Defendants must then provide a hearing once requested and prior to placement on a Special Focus Facility list.

126. Defendants' failure to permit an appeal before a neutral adjudicator and/or a judicial review prior to imposition the penalty of placement on the SFF denies the Facility due process prior to the imposition of the remedy.

127. Defendants failure to allow for a hearing and appeal before placement on the SFF a penalty which affects Plaintiff's business prospects does not adequately apprise Plaintiff of the actions against them, or of the reasons for such deprivation.

128. Such actions by Defendants are inconsistent with the Due Process Clause of the United States Constitution, Amendment XIV and the Medicaid Act, Title XIX of the Social Security Act, Title 42 § 1396a, et seq., and its implementing regulations.

129. Defendants actions are not in compliance with law requiring administrative review of disputed deficiencies.

130. Defendants acted willfully, knowingly, and purposefully with the specific intent to deprive Plaintiffs of their rights, privileges, and immunities secured by the Constitution and laws by the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States and by 42 U.S.C. §1983.

131. The above acts were committed under color of state law by the Defendants. Said acts were committed by the Defendants by and through representatives of the Defendants acting in their official capacities pursuant to the statutes, ordinances, laws and policies of the Defendants.

132. Defendants do not have adequate justification for refusing Plaintiffs a hearing on the alleged deficiencies prior to use of these alleged deficiencies for publication or placement on the SFF.

## COUNT TWO—DECLARATORY JUDGMENT

133. Plaintiffs incorporate all paragraphs set out above as if fully set forth herein.

134. The right to notice and hearing is a fundamental right – the cornerstone of constitutional protections.

135. Plaintiffs are entitled to a declaration pursuant to 42 U.S.C. § 1983, that their civil rights have been violated by IDPH, CMS, and the Administrator by their refusal to allow for a hearing, by violating survey disclosure requirements, and by placement on the SFF prior to a full hearing on the alleged violations that caused that placement.

136. The Defendants' failure to provide that hearing fails to comply with the requirements of due process and violate the civil rights of the Plaintiff Facility.

137. Where a provider appeals a deficiency claimed in a survey, the deficiency must either be dismissed or reviewed.

138. The Defendants' failure to comply with federal law and regulations regarding Plaintiffs' hearing rights and survey result disclosure requirements governed by federal law and placement on the SFF, place Plaintiffs at risk of being deprived of property interests without due process.

139. By failing to comply with the federal rules and regulations by denying the right to a hearing, Defendants deprived Plaintiff Facilities of the rights, privileges and immunities secured by the Constitution and laws of the United States, in violation of 42 U.S.C. § 1983, and as preempted by the Supremacy Clause of the United States Constitution, Article VI.

140. The burden placed on Defendants, should the Court grant the relief requested in this action, is simply that Defendants will be required to comply with federal Medicare and Medicaid laws, grant hearings after all deficiencies issued, and refrain from posting or using

deficiencies until a final order has been entered. Defendants stand to suffer diminutive, if any, burden by affording Plaintiffs the hearings to which they are entitled pursuant to federal law.

141. Pursuant to 28 U.S.C. § 2201, and Rule 57 of the Federal Rules of Civil Procedure, Plaintiffs seek declaratory relief by this Court.

142. It is well settled that the District Court's exercise of discretion in a declaratory judgement action should be informed by a number of prudential facts, including: (1) consideration of practicality and efficient judicial administration; (2) the functions and limitations of the federal judicial power; (3) traditional principles of equity, comity, and federalism; (4) Eleventh Amendment and other constitutional concerns; and (5) the public interest. *Smith & Usaha,* note 2, at 116 citing *Wilton v. Seven Falls Company,* 515 U.S. 288 (1995); *Green v. Mansour*, 474, U.S. 64, 72-74 (1985); *Rickover,* 369 U.S. 111 at 112-113; *Public Service Commission of Utah v. Wycoff Company,* 344 U.S. 237, 243-47 (1952).

143. The most important factors are whether a declaratory judgement will serve a useful purpose and resolve the controversy between the parties. *Smith & Usaha, supra* note 2, at 116 (collecting cases; *Wilton,* 515 U.S. at 288; *Green v. Mansour,* 474 U.S. 64, 74 (1985); *Rickover,* 369 U.S. 111 at 112-113; *Wycoff,* 344 U.S. at 244.

144. Plaintiffs seek a Declaratory Judgement from this Court requiring Defendants to afford Plaintiffs sufficient appeal and fair hearing rights prior to imposing penalties and posting deficiencies and placement on the SFF.

### COUNT THREE - 42 U.S.C. §§ 1983 & 1988 – INJUNCTIVE RELIEF AGAINST DEFENDANT CMS AND HFS

145. Plaintiff incorporates and reallege the allegations asserted in each of the preceding paragraphs, as if fully set forth herein.

146. Section 1983 of Title 42 of the United States Code provides that any person under color of state law who deprives a citizen of the United States of any federal rights, privilege, or immunity "shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress. . . " 42 U.S.C. § 1983.

147. Defendants, in their official capacity, are a person under 42 U.S.C. § 1983 for purposes of declaratory and injunctive relief.

148. The actions of IDPH and the Administrator described in this Complaint have been taken under the color of State law and Federal law.

149. Plaintiff demands temporary and permanent injunctive relief requiring that Defendants cease imposing remedies in violation of the CMS State Operations Manual and state plan until the final outcome of an evidentiary hearing before a fair and impartial arbiter. 42 C.F.R. § 488.406(c); 42 C.F.R.. § 431.153(a); 5 U.S.C. § 706(2)(D).

150. Plaintiff is entitled to a preliminary injunction, pursuant to 42 U.S.C. § 1983, requiring Defendants to afford Plaintiff an evidentiary hearing on each Notice of Deficiencies issued prior to placement on the SFF. 42. C.F.R. § 498 *et seq.*

151. Plaintiff is entitled to a preliminary injunction, pursuant to 42 U.S.C. § 1983, requiring Defendants to cease imposition of remedies that have not been approved by CMS in state plan amendments. *See* 42 C.F.R. § 430.12(c)(1)(ii); *See also* 42 U.S.C. § 1316(a)(1) and (b).

152. Plaintiff is entitled to a mandatory injunction, pursuant to 42 U.S.C. § 1983, requiring IDPH and CMS cease disclosure and use of alleged deficiencies for placement on the SFF list prior to an evidentiary hearing in violation of 42 C.F.R. §488.325.

## V. REQUESTS FOR RELIEF

Plaintiffs respectfully request that this Court:

A.      Issue a Declaratory Judgment in favor of Plaintiffs, requiring Defendant to adhere to the requirements of the Social Security Act and implementing regulations pursuant to 42 U.S.C. § 1396(c);

B.      Issue Preliminary and Permanent Injunctive relief enjoining the Defendant from subjecting Plaintiffs to practices that violate their rights under the Social Security Act and implementing regulations pursuant to pursuant to 42 U.S.C. § 1396(c);

C.      Issue Preliminary and Permanent Injunctive relief requiring Defendants to adhere to federally mandated right to impartial evidentiary hearing and cease violations of due process.

D.      Issue Preliminary and Permanent Injunctive relief requiring Defendants to cease imposition of remedies imposed in violation of due process and the state plan;

E.      Issue Preliminary and Permanent Injunctive relief requiring Defendants to cease disclosure of survey results in violation of due process and the state plan;

F.      Award such other relief as the Court deems just and appropriate.


Respectfully submitted,


By:      s/ Eva M. Byerley

Generations Health Care Network
6840 N. Lincoln Ave
Lincolnwood, Illinois 60712
Telephone: (847)675-7979
Facsimile:
Email: ebyerley@generationshcn.com
*Attorney for Plaintiff*

23